# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JACOB PINARD; MARK LIPKE;
GRIFFIN LINN; HARRY MILLS; TYSON
JARVI; TRAVIS JEFFERS; NATHAN
WHITE; D. J. CRAWFORD;
CHRISTOPHER SOMES,
        *Plaintiffs-Appellants,*

v.

CLATSKANIE SCHOOL DISTRICT 6J, a
public body; JEFF BAUGHMAN;
MICHAEL CORLEY; LES WALLACE;
EARL FISHER,
        *Defendants-Appellees.*

No. 04-35574

D.C. No.
CV-03-00172-ALC

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
September 15, 2005—Portland, Oregon

Filed May 1, 2006
Amended October 30, 2006

Before: Raymond C. Fisher, Ronald M. Gould and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Fisher

17989

## COUNSEL

Michael R. Seidl (argued) and Lori K. DeDobbelaere, Seidl Law Office, P.C., Portland, Oregon, for the plaintiffs-appellants.

Peter R. Mersereau (argued) and Thomas W. McPherson, Mersereau & Shannon, LLP, Portland, Oregon, for the defendants-appellees.

## ORDER

The court *sua sponte* has amended the opinion filed at 446 F.3d 964 (2006). The amended opinion is filed concurrently with this order. The parties may file petitions for rehearing based on the amended opinion.

**OPINION**

FISHER, Circuit Judge:

This student speech case arises from a school district's suspension of student athletes from its high school varsity basketball team. The students allege that the school district and various school officials violated their First Amendment free speech rights by suspending them in retaliation for speaking out against their coach. The district court granted summary judgment against the students, concluding that they were not engaged in a constitutionally protected activity because their speech did not involve a matter of public concern. In the alternative, the court concluded that the school district could constitutionally punish the students because their decision not to board a team bus and play in a regularly scheduled out-of-town game substantially and materially interfered with a school activity.

We hold that the district court erred in adopting from the government employment context the public concern standard for determining whether the First Amendment protects student speech. Under the proper standard articulated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 514 (1969), the students' petition and complaints against the coach were protected speech because they could not reasonably have led school officials to forecast substantial disruption of or material interference with a school activity. However, we agree with the district court that the students' refusal to board the bus was not protected by the First Amendment because, even if expressive conduct, it substantially disrupted and materially interfered with the operation of the varsity boys basketball program. The district court did not, however, consider the plaintiffs' retaliation claims. We therefore reverse and remand for further proceedings consistent with this opinion.[1]

---

[1]We do not address the applicability of *United States v. O'Brien*, 391 U.S. 367 (1968), to this case. *O'Brien* laid out a four-part test for assessing

## I.  Factual and Procedural Background

Plaintiffs are eight former members of the 2000-01 Clatskanie High School varsity boys basketball team in Clatskanie, Oregon.[2] The defendants include the Clatskanie School District, Jeff Baughman (the varsity boys basketball coach), Michael Corley (the high school principal), Lester Wallace (the high school athletic director), and Earl Fisher (the superintendent).[3] Baughman, a teacher at the high school before tak-

---

content-neutral regulations that restrict speech or inherently expressive conduct. Under *O'Brien*, such a regulation must be upheld "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377. The *O'Brien* framework has been employed by a number of courts in recent school uniform cases. *See Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437 (5th Cir. 2001); *Littlefield v. Forney Ind. Sch. Dist.*, 268 F.3d 275 (5th Cir. 2001); *Jacobs v. Clark County Sch. Dist.*, 373 F. Supp. 2d 1162 (D. Nev. 2005). Our circuit, however, has not invoked *O'Brien* in this context.

We decline to apply *O'Brien* here for two reasons. First, the *Tinker* framework is appropriate for analyzing restrictions on student speech that is neither school-sponsored nor "vulgar, lewd, obscene and plainly offensive." *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992); see Section III.C., *infra*. Second, the district court did not consider *O'Brien*'s applicability, and the parties did not argue before the district court or this court that *O'Brien* should apply, addressing the issue only at our request after we filed our original opinion. We therefore lack the requisite factual record to determine whether *O'Brien* should apply and, if so, what the outcome should be. The parties may on remand address in the district court whether *O'Brien* applies and present such evidence as may be necessary for its meaningful application, including whether the school's policy was content-neutral, whether it was followed when the students were suspended, why the students were suspended, and what incidental restrictions on free speech resulted from the school's policy.

[2]Christopher Somes was an original plaintiff in this case, but voluntarily dismissed his claims on April 24, 2003.

[3]In July 2001, Corley replaced Fisher as superintendent during the events in this case.

ing on coaching responsibilities, became the team's head coach for the 2000-01 school year.

Considering the evidence in the light most favorable to the plaintiffs, as we must at this stage of the litigation, *see Bingham v. City of Manhattan Beach*, 341 F.3d 939, 945-46 (9th Cir. 2003), Baughman was verbally abusive and highly intimidating. For example, plaintiff D.J. Crawford testified that after a game, Baughman had him hold a basketball while Baughman "slapped" and "beat" at it (also "hitting [Crawford's] arms") to make sure he was holding the ball tightly. Although the ball-holding drill might recreate a game situation, what followed was inappropriate. Baughman made a triangular shape with his fingers and told Crawford, "You know what this is? This is what you are. You are a fucking pussy."[4] Describing Baughman's intimidation tactics, plaintiff Griffin Linn testified that Baughman once told the team, "I can fuck with your minds in so many ways you won't know which way is up, and don't think I can't. I'll make your lives a living hell."[5] Linn explained that the players did not report Baughman's behavior because Baughman made it clear that "anything that happened in the locker room stays in the locker room."

After one particular home game, Baughman told the players that if they wanted him to quit, they should say so, and he would resign.[6] The players apparently took Baughman at his

---

[4]Plaintiff Griffin Linn testified that similar incidents "occurred in the locker room with Baughman singling out players and physically intimidating them, and basically just bullying people into submission."

[5]Linn described Baughman's conduct as "verbal abuse, yelling, humiliation, ranting, [and] raving." He also testified that Baughman had thrown pens and towels, broken a dry erase board over his knee and kicked garbage cans in the locker room. Other plaintiffs similarly testified to Baughman's incessant yelling, profanity and abusive coaching tactics.

[6]Plaintiff Jacob Pinard, a senior at the time and a team captain, recalls that "Baughman was really upset because of the way we played." Baughman sat the team down in a half circle and said "something like, 'if you

word. On February 12, 2001, several weeks after Baughman's statement, co-captains Jacob Pinard and Christopher Somes called a team meeting at a local restaurant to discuss Baughman's behavior. Before the meeting, one of the plaintiffs typed up a petition requesting that Baughman resign. The petition stated:

> As of February 12, 2001, the Clatskanie Tigers Boys Varsity Basketball Team would like to formally request the immediate resignation of Coach Jeff Baughman. As a team we no longer feel comfortable playing for him as a coach. He has made derogative [sic] remarks, made players uncomfortable playing for him, and is not leading the team in the right direction. We feel that as a team and as individuals we would be better off if we were to finish the season with a replacement coach. We, the undersign [sic], believe this is in the best interest of the team, school, town, and for the players and fans. We would appreciate the full cooperation of all the parties involved.

With the exception of a foreign exchange student, every varsity player attended the meeting, including Baughman's son. No coaches, teachers or parents attended. After discussing the petition, all but one of the players (Baughman's son) signed it. The players also added a type-written note beneath the signatures stating: "[W]e will not be approached individually on

guys want me to fucking quit the team or you want me to resign, then just tell me so and I will.' " Plaintiffs Griffin Linn, Mark Lipke, Travis Jeffers, Tyson Jarvi and Nathan White similarly testified to Baughman's offer to quit as head coach. In addition, Gary Points, an assistant coach, testified that Baughman repeated his remarks when Points asked him what he had told the players after this particular game. According to Points, Baughman said, "I told them if they don't want me to be their coach, say the word and I'll go."

this. This was a team decision and we will be addressed as a team."

The following morning, co-captain Somes delivered the petition to Baughman. The coach immediately took it to the high school principal, defendant Corley, who was in a meeting with the superintendent, defendant Fisher. The three defendants met for 10 to 15 minutes, during which time Baughman expressed that he was "confused," "very upset" and "hurt." Although none of these defendants could recall exactly what was discussed during this meeting, Corley remembers recommending that Baughman not resign, and Superintendent Fisher suggested that they meet with the players to "find out the detail" of the petition. Baughman was also concerned because the team was scheduled to play an important away game that evening. Upset by the events of the morning, Baughman asked Corley for permission to take off the remainder of the day, which Corley granted. Corley did not ask Baughman whether he would coach the game that night.

Once home, Baughman called the junior varsity coach, Gary Points, "to inform him of the situation." According to Points, Baughman stated that he "wanted to know who his back-stabbers were" and wanted "to corner the little sons-of-bitches and not give them an out." When Points asked what Baughman meant, Baughman responded that Corley had given him two options: he could either resign, or decide not to resign and tell the players to either get on the bus and play or if they chose not to board the bus to turn in their uniforms. According to Points, Baughman claimed that Corley and Wallace were advising him to choose the second option.

After Baughman left the school, Corley called a meeting with athletic director Wallace and all of the players who had signed the petition.[7] The players told Corley and Wallace

---

[7]Corley first called plaintiff Mark Lipke into the meeting, but he indicated he would not be approached as an individual.

about Baughman's derogatory remarks, stated he was unfair and expressed their discomfort in playing for him. When the players indicated that they would not play on the team if Baughman was going to coach them, Corley and Wallace explained they could not have Baughman immediately removed without an investigation. According to the plaintiffs, Corley and Wallace presented the players with two options: the players could participate in a mediation process with the two of them serving as mediators and board the team bus for the game that evening, or they could adhere to their position and forfeit their privilege to play in the game. The plaintiffs contend that neither Corley nor Wallace advised them that they would be disciplined further for choosing the second option.[8] The meeting ended without the players expressing whether they intended to board the bus.

Later in the day, Baughman informed Corley and Wallace that he was not going to coach the game that evening. Wallace then made arrangements for a substitute coach to replace Baughman. Corley and Wallace did not inform the players of Baughman's decision.

With the exception of Somes, each of the players who had signed the petition chose not to board the bus and did not play in the game. The junior varsity team played in place of the eight missing players along with Somes, Baughman's son and the foreign exchange student, losing the game by more than 50 points. Baughman did not coach the team, and most of the plaintiffs attended the game as spectators. The plaintiffs con-

---

[8]In the plaintiffs' Student Grievance Forms (filed to appeal their suspension), Corley wrote that the players were told they would be "off the team" and that they would be "through for the season" if they "did not get on the bus." However, Corley later testified that he did not recall ever telling the players that they would be suspended from the team for failing to board the bus. When plaintiffs' counsel asked Wallace if he agreed with Corley's testimony, Wallace responded, "I agree that he may have said that." Plaintiffs' counsel then clarified that Corley testified he did *not* recall warning the players, to which Wallace responded, "Well, I don't remember either."

tend they decided not to board the bus to demonstrate their resolve and sincerity concerning the petition and complaints against Baughman. They also maintain they would not have refused to travel with the team had they known Baughman was not coaching.

The next day, Corley and Wallace met with the plaintiffs, Somes and several of the players' parents. According to two of the parents in attendance, Corley announced that "all of the players *who signed the petition* were permanently suspended from the team" (emphasis added).[9] Corley stated in the district court that he alone decided to suspend the players from the team, but that he did *not* suspend Somes (who had signed the petition but boarded the bus and played in the game). Rather, the suspension applied only to those members of the team "who had refused to board [the] team bus . . . and play basketball that evening."[10] Although the defendants now argue that Corley had authority to suspend the plaintiffs under the school's "Code of Conduct and Appearance for Athletes," it is not clear from the record that the Code played any role in

---

[9]The district court struck several paragraphs from the declarations of these two parents. The plaintiffs, however, included in the excerpts of record the entirety of these declarations without noting that certain paragraphs had been stricken, and the plaintiffs have in their briefs cited to pages from these declarations that contain stricken evidence. In our review, we have ignored all such stricken evidence and rely only on any *non-stricken* evidence found on pages containing inadmissible evidence. Because the pages plaintiffs cite contain admissible evidence that supports the proposition for which the page was cited, we decline to exercise our discretion to impose sanctions upon plaintiffs under Circuit Rule 30-2.

[10]In a memorandum signed February 15, 2001, the day after ordering the suspensions, Corley formally stated his decision: "Players who remained committed to the petition *and* refused [to] participate in the [out-of-town] game are considered to have forfeited their membership in the Clatskanie varsity basketball team and will not be allowed to participate in further competitions" (emphasis added).

Corley's decision. Indeed, Corley conceded in a deposition that he was unfamiliar with the Code's contents.[11]

Each of the plaintiffs appealed his suspension to Superintendent Fisher, who assigned the investigation to Mary Mitchell, a part-time special education administrator. Mitchell affirmed Corley's decision to suspend the plaintiffs, and the school board upheld Mitchell's decision.[12]

On February 7, 2003, the plaintiffs filed their lawsuit under 42 U.S.C. § 1983, alleging that the defendants punished them for complaining about Baughman in violation of the First Amendment. The defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), arguing that the plaintiffs' speech was not constitutionally protected because it failed to touch upon a matter of public concern. The district court denied the motion. In doing so, the court concluded that the public concern test, which "originat[ed] in the public employment context," does not apply in the public school context. The defendants then moved for summary judgment, which the district court granted. Contrary to its order denying the defendants' motion to dismiss the complaint, the district court concluded that the plaintiffs "were not engaged in a constitutionally protected activity" because the plaintiffs' speech "was not a matter of public concern nor political in nature" but instead was akin to speech that "address[ed] merely a private grievance against a school employee, with no

---

[11]The Code states:

1.   The athlete will travel to and from contests with coach and team unless specific arrangements are made with the coach in person by parent or guardian prior to departure time.

. . .

4.   An athlete may be disciplined for conduct termed detrimental to the team and/or school.

[12]In her written decision, Mitchell explained that "Corley had no choice but to make plans for ending the basketball season without the players who said they would no longer play with Coach Baughman."

political dimension." In the alternative, the district court concluded that even if the plaintiffs' speech was constitutionally protected, their conduct "substantially and materially interfered with a school activity," giving the school district authority to punish them. The plaintiffs timely appealed.

## II.  Standard of Review

We review a district court's decision to grant summary judgment de novo. *Gammoh v. City of La Habra*, 395 F.3d 1114, 1122 (9th Cir. 2005). We must determine "whether, viewing the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). All reasonable inferences are resolved in favor of the nonmoving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). We review for clear error the district court's findings of fact. *Metropolitan Life Ins. Co. v. Parker*, 436 F.3d 1109, 1113 (9th Cir. 2006).

## III.  Discussion

The plaintiffs argue that their petition, complaints to Corley and Wallace and decision to take the option of not playing in the away game constitute speech protected by the First Amendment. The defendants agree that the petition standing alone is "pure speech." *See Bartnicki v. Vopper*, 532 U.S. 514, 526-27 (2001) (suggesting that the "delivery of a tape recording," "handbill" or "pamphlet" are forms of "pure speech"). The defendants also agree that the plaintiffs' refusal to board the bus — while itself not "pure speech" — was "inseparable" from the petition. However, the defendants argue that the plaintiffs' entire course of conduct — the petition, complaints against Baughman and the boycott of the game — was not constitutionally protected because it had no political dimension, was not a matter of public concern and materially interfered with the school's basketball program. The defendants

further contend that the plaintiffs were suspended not for their petition or complaints against Baughman, but *only* for their refusal to board the bus.

**[1]** We have long held that students in public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *See Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 527 (9th Cir. 1992) (quoting *Tinker*, 393 U.S. at 506). However, our precedents make equally clear that the First Amendment rights of public school students " 'are not automatically coextensive with the rights of adults in other settings' and must be 'applied in light of the special characteristics of the school environment.' " *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 988 (9th Cir. 2001) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)). Thus, in the school context, "we have granted educators substantial deference as to what speech is appropriate." *Id.* But "deference does not mean abdication; there are situations where school officials overstep their bounds and violate the Constitution." *Id.* Our task is to determine whether the district court erred in concluding that this case does not present such a situation.

## A.   Plaintiffs' Speech

**[2]** This case involves both a petition — a form of "pure speech" — as well as potentially expressive conduct in the form of the plaintiffs' refusal to board the bus. *See, e.g., Tinker*, 393 U.S. at 505-06 (describing the wearing of armbands as akin to "pure speech"); *see also Baldwin v. Redwood City*, 540 F.2d 1360, 1366 (9th Cir. 1976) (suggesting that the "element of conduct" in pure speech is "minimal"). Although the defendants concede that the petition "standing alone" is pure speech, they characterize the plaintiffs' petition, complaints against Baughman and refusal to board the bus as both "concerted action" and one "course of conduct," the entirety of which is constitutionally punishable under *Tinker*. We dis-

agree with that view.[13] As we discuss in Section III.C, because the plaintiffs' petition and grievances against Baughman are a form of pure speech, the defendants may not constitutionally punish the plaintiffs just for filing their petition or complaining about Baughman unless they show "facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities" *as a result of the petition or complaints*. *Tinker*, 393 U.S. at 514.[14]

As for the plaintiffs' refusal to board the bus and play in the game, the plaintiffs assume that this conduct falls within the ambit of the First Amendment's protections because it is expressive in nature. *See, e.g.*, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, ___ U.S. ___, 126 S. Ct. 1297, 1310 (2006) ("*FAIR*") (explaining that the Supreme Court has "extended First Amendment protection only to conduct that is inherently expressive"); *Roulette v. City of Seattle*, 97 F.3d 300, 302-03 (9th Cir. 1996) ("The First Amendment protects not only the expression of ideas through printed or spoken words, but also symbolic speech — nonverbal 'activity . . . sufficiently imbued with elements of communication.' " (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974))). As we explain below, however, we ultimately need not decide whether the plaintiffs' boycott of the game constitutes "inherently expressive" conduct encompassed by the First Amendment, because even if it does the boycott was properly punishable under *Tinker*.

## B.   Public Concern Requirement

We turn to whether the First Amendment protects the plain-

---

[13]The district court did not make findings of fact or conclusions of law as to what constituted the plaintiffs' speech.

[14]As we discuss in Section III.B, we also reject the defendants' argument that the petition and complaints against Baughman do not constitute protected speech because they fail to touch upon a matter of public concern.

tiffs from being disciplined for their petition and complaints against Baughman. As an initial matter, the plaintiffs argue that the district court erroneously applied the "public concern" test, which applies in the public employment context, to determine whether the First Amendment protects student speech. They assert that the proper First Amendment framework for student speech cases is set forth in the Supreme Court's decision in *Tinker* and its progeny and our decision in *Chandler*. We agree.

**[3]** In *Chandler*, we reviewed the Supreme Court's student speech cases and identified three categories of speech that school officials may constitutionally regulate, each of which is governed by different Supreme Court precedent:

> (1)   vulgar, lewd, obscene and plainly offensive speech is governed by *Bethel School District v. Fraser*, 478 U.S. 675 (1986);

> (2)   school-sponsored speech is governed by *Hazelwood*; and

> (3)   speech that falls into neither of these categories is governed by *Tinker*.

978 F.2d at 529; *see also Frederick v. Morse*, 439 F.3d 1114, 1121 (9th Cir. 2006); *LaVine*, 257 F.3d at 988-89. The plaintiffs' speech falls within the third category. The question is whether *Tinker* contains the public concern requirement applicable in the government employment context, as the district court concluded. We hold that it does not.

**[4]** In *Tinker*, the Supreme Court held that the school district violated the First Amendment rights of students when it suspended them for wearing black armbands in protest of the Vietnam War. 393 U.S. at 513-14. The Court explained that school officials could not restrain the students' speech without showing "facts which might reasonably have led school

authorities to forecast substantial disruption of or material interference with school activities." *Id.* at 514. Because the speech "was a silent, passive expression of opinion, unaccompanied by any disorder or disturbance" that "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others," the Court held that the First Amendment prohibited school officials from denying their expression. *Id.* at 508, 514. In *Chandler*, we applied *Tinker* to "third category" speech and held that buttons and stickers worn by students in support of a lawful teacher strike were not inherently disruptive. 978 F.2d at 530.

By importing into the educational context the public concern test established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983), both of which dealt with speech by government employees, the district court misread *Tinker* and our own precedents. *Pickering* requires a court evaluating restraints on a public employee's speech to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568; *see also City of San Diego v. Roe*, 543 U.S. 77, 82 (2004). As the Court explained in *Connick*, in order to merit *Pickering* balancing, a public employee's speech must touch on a matter of "public concern." 461 U.S. at 143. Thus, a public employer may constitutionally suppress an employee's speech addressing "matters only of personal interest" — such as personnel matters pertaining to the speaker's job performance or terms and conditions of employment — in order to promote an efficient workplace and the effective delivery of public services. *Id.* at 147, 150-51. However, if the government employee's speech touches upon a matter of public concern, the First Amendment may protect it. *Id.* at 146.[15]

---

[15]Even though *Connick*'s holding was limited to the employment context, *see* 461 U.S. at 147, the Supreme Court emphasized that it was "in

**[5]** Although *Connick*'s personal matter/public concern distinction is the appropriate mechanism for determining the parameters of a public employer's need to regulate the workplace, neither we, the Supreme Court nor any other federal court of appeals has held such a distinction applicable in student speech cases, and we decline to do so here.[16] In striking the balance "between the First Amendment rights of students and preservation of the educational process," *LaVine*, 257 F.3d at 988, neither *Tinker* nor its progeny limited students' rights solely to the exercise of political speech or speech that touches on a matter of public concern. *See, e.g.*, *Hazelwood*, 484 U.S. at 266 ("[Public school students] cannot be punished *merely for expressing their personal views* on the school

---

no sense suggest[ing] that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction." *Id.*; *cf. United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 223 (1967) ("[T]he First Amendment does not protect speech and assembly only to the extent it can be characterized as political.").

[16]We recognize that *Connick*'s public concern test has been applied in cases where the relationship between the plaintiff and the government was sufficiently similar to an employment relationship. *See, e.g.*, *Rivero v. City & County of San Francisco*, 316 F.3d 857, 864 (9th Cir. 2002) (applying the public concern test in a case involving government retaliation against an independent contractor). However, we find any such similarity lacking in cases involving students and public school officials. In addition, although we recently recognized the "political viewpoint" of the speech protected in *Tinker* and suggested that a student banner with the phrase "Bong Hits 4 Jesus" may have similarly constituted "political speech," we did so in the context of distinguishing *Fraser*, which governs "plainly offensive" student speech. *See Frederick v. Morse*, 439 F.3d at 1118-19. We did not, however, hold that *Tinker* protected only political speech or speech that touches upon a matter of public concern. Rather, we affirmed that it is "well-established" that "student speech that is neither plainly offensive nor school-sponsored can be prohibited *only where the school district demonstrated a risk of substantial disruption.*" *Id.* at 1121; *see also id.* at 1123 ("*Tinker* requires that, to censor or punish student speech, the school must show a reasonable concern about the likelihood of substantial disruption to its educational mission.").

premises . . . unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.' " (quoting *Tinker*, 393 U.S. at 509) (emphasis added)). Rather, as our cases demonstrate, *Tinker*'s test for determining whether the First Amendment protects "third category" student speech examines only the *effect* of the speech on school activities and the rights of others. *See, e.g.*, *LaVine*, 257 F.3d at 989-92; *Chandler*, 978 F.2d at 529-30; *Karp v. Becken*, 477 F.2d 171, 176 (9th Cir. 1973).[17]

**[6]** In short, we do not read *Tinker*, its progeny or our own cases applying its standard as importing *Connick*'s public concern test into the public education context, and we see no occasion to do so here.[18] We therefore reaffirm *Chandler*'s

---

[17]As *Tinker* itself explained, a student "may express his opinions . . . if he does so without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others." 393 U.S. at 513 (internal quotations omitted). Whether the speech is public or private in nature has not been considered relevant to *Tinker*'s analysis. *See, e.g.*, *LaVine*, 257 F.3d at 989-92 (concluding that the student's speech, a poem, fell within *Chandler's* third category of speech and applying *Tinker* without determining whether the speech was political or touched upon a matter of public concern). Significantly, *Tinker* does not require school officials to wait until disruption or interference actually occurs before suppressing student speech, nor does it require certainty that disruption will occur. *Id.* at 989.

[18]Indeed, the defendants point to no case since *Tinker* that has allowed school officials to suppress or punish student speech simply because the students' speech was construed as addressing a personal or private matter — without a showing of facts that would lead school officials reasonably to forecast an interference with or disruption of school activities. But even assuming *Tinker* were to include a public concern requirement, the district court erred in concluding that the plaintiffs' speech was "merely a private grievance." The plaintiffs' criticisms of Baughman were related to various issues of "concern to the community," including the school's performance of its duties to supervise its teachers, monitor extracurricular activities and provide a safe and appropriate learning environment for its students. *See Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 978 (9th Cir.1998) (quoting *Connick*, 461 U.S. at 146). These are matters of public concern.

holding that the First Amendment protects all student speech that is neither school-sponsored, a true threat nor vulgar, lewd, obscene or plainly offensive unless school officials show "facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities." *Chandler*, 978 F.2d at 529 (quoting *Tinker*, 393 U.S. at 514).[19]

We recognize that the state charges school officials with the daily administration of public education, that this "responsibility carries with it the inherent authority to prescribe and control conduct in the schools," *LaVine*, 257 F.3d at 988 (quoting *Karp*, 477 F.2d at 174), and that "the determination of what manner of speech in [schools] is inappropriate properly rests with the school board, rather than with the federal courts." *Hazelwood*, 484 U.S. at 267 (internal citation omitted). However, our deference to school officials in regulating student speech does not diminish our duty to ensure that they do not infringe students' First Amendment rights under *Tinker*. Justice Jackson's observation 60 years ago is no less applicable today than it was then:

> [School officials] have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the

---

[19]The defendants overstate the concern that our reversal of the district court's contrary conclusion will invite federal lawsuits concerning the everyday disciplinary decisions of public schools. Far from setting a "dangerous precedent," our holding merely follows *Tinker,* which for more than three decades has adequately balanced the important interests at stake in student speech cases. When a student's expressive activity leads a school official reasonably to believe that the activity will impinge upon the rights of other students, or substantially disrupt or materially interfere with the work of the school — or if the activity in fact causes such harms — school officials may take preventative or disciplinary action. *See, e.g.*, *LaVine*, 257 F.3d at 989-90, 992 (holding constitutional a school district's emergency expulsion of a student because school officials "had facts which might reasonably have led them to forecast a substantial disruption of or material interference with school activities").

Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943); *see also Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 876 (Blackmun, J., concurring) ("[I]t is beyond dispute that schools and school boards must operate within the confines of the First Amendment.").

## C.   Applying *Tinker*

**[7]** Because the plaintiffs' speech falls within *Chandler's* third category of "all other speech," the defendants must justify their decision to suspend the players permanently by showing "facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. The *Tinker* rule is a "flexible one," *Karp*, 477 F.2d at 174, and in applying it, "we look to the totality of the relevant facts," including not only the plaintiffs' actions, but "all of the circumstances confronting the school officials" at the time. *LaVine*, 257 F.3d at 989. "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," and the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" cannot justify a school official's decision to punish or prohibit student speech. *Tinker*, 393 U.S. at 508-09.

**[8]** Applying these guiding principles here, we conclude that the First Amendment protects the players' petition and their complaints to Corley and Wallace during the ensuing meeting. The defendants do not dispute that the petition and meeting neither disrupted school activities nor impinged on

the rights of other students, and the record contains no evidence that Corley suspended the plaintiffs out of any such concern. The players handed their petition to Baughman directly at the start of a school day, and after Baughman left the school, they explained their complaint only to Corley and Wallace in a private meeting. These facts closely resemble those reviewed by the Tenth Circuit in *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996). *Seamons* held that the First Amendment protected a student athlete's report to school authorities of a physical assault, because the student's speech "was responsibly tailored to the audience of school administrators, coaches, family and participants who needed to know about the incident." *Id.* at 1237-38.

**[9]** It is also relevant that neither Corley nor Wallace informed the players of Baughman's decision not to coach the team that evening, even though the players had clearly stated that Baughman was the reason they did not want to play. Thus, to the extent that the petition and meeting might have given the school officials a "reason to anticipate" disruption of the game, the totality of the relevant facts reveals that any such expectation would have been unreasonable given Corley's and Wallace's knowledge of Baughman's decision. Had Corley and Wallace told the players that Baughman was not coaching that night — and the record reveals no reason why they could not have — it appears that the players would have boarded the bus.

**[10]** Finally, assuming without deciding that the plaintiffs' refusal to board the bus constituted expressive conduct encompassed by the First Amendment, we agree with the district court that the plaintiffs' boycott of the game substantially disrupted and materially interfered with a school activity. Comparing the conduct at issue here with the wearing of armbands in *Tinker* demonstrates why the district court's decision was correct.

In holding that the First Amendment protected the students' right to wear a black armband to school to protest the Viet-

nam War, *Tinker* noted that "the wearing of armbands . . . was entirely divorced from actually or potentially disruptive conduct by those participating in it." 393 U.S. at 505. The Court emphasized that the "school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners." *Id.* at 508. It also noted that the district court made "no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of *appropriate discipline in the operation of the school*," *id.* at 509 (internal quotation marks omitted) (emphasis added), and that there was "no evidence whatever of [the protestors'] interference, actual or nascent, with the *schools' work*," *id.* at 508 (emphasis added). In holding that a student's First Amendment rights are "not confined to the supervised and ordained discussion which takes place in the classroom," the Court extended *Tinker*'s principles to school activities broadly defined, including extracurricular activities:

> When [a student] is in the cafeteria, *or on the playing field*, or on the campus during the authorized hours, he may express his opinions . . . if he does so without materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school . . . . But conduct by the student, *in class or out of it*, which for *any reason* — whether it stems from time, place, or type of behavior — materially disrupts classwork or involves *substantial disorder* or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id.* at 512-13 (internal citations and quotation marks omitted) (emphasis added).

In this case, unlike in *Tinker*, there is undisputed evidence to support the district court's explicit finding that the plaintiffs' refusal to board the bus for the away game "material[ly]

disrupt[ed] . . . the operation of the boys' varsity basketball team." As a general matter, school districts spend much time and money scheduling and hosting their extracurricular events — part of the school's educational program — which involve the coordination of multiple school officials, students, parents and often times volunteers, referees and bus drivers. Here, there is no dispute that the plaintiffs constituted all but three members of the varsity team. Similarly, it is undisputed that the boycotted event was a regularly scheduled out of town game against a rival school, part of the school's varsity basketball program, that the varsity team was scheduled to travel to the game on a school bus and that the plaintiffs refused to board the bus only a few hours before the game was scheduled to begin. The last minute boycott of a regularly scheduled game by nearly every member of the team forced the district either to play the game with replacement players or cancel the event. That the school succeeded in obtaining substitute players — albeit of lesser experience and ability — may have mitigated the disruptive effects of the plaintiffs' actions, but it did not eliminate them or render them less than substantial. Either option materially interfered with the school district's operation of a bona fide school activity.

[11] Under these circumstances, the plaintiffs' conduct plainly "interrupted school activities" and "intrude[d] in the school['s] affairs." *Tinker*, 393. U.S. at 514. Thus, even if we viewed the plaintiffs' boycott as symbolic speech within the First Amendment, school officials could permissibly discipline the players for this disruptive conduct. Like Justice Brennan, we recognize that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). At the same time, we cannot ignore *Tinker*'s admonition that the First Amendment is properly read to permit a school district's "reasonable regulation of speech-connected activities in *carefully restricted* circum-

stances." *Tinker*, 393 U.S. at 513 (emphasis added). Those circumstances were met here.

## D. Retaliation Against the Plaintiffs' Exercise of Protected Speech

[12] The remaining question is whether the plaintiffs' permanent suspension from the basketball team was simply for refusing to board the bus, or instead was wholly or partly in retaliation for petitioning against Baughman in the first place. The district court did not reach this question because it concluded that the plaintiffs' speech was not protected at all. The record is not sufficiently clear for us to resolve the retaliation issue on this appeal, so we shall remand to the district court for further proceedings.

To establish a First Amendment retaliation claim in the student speech context, a plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct. *See Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1300-01 (9th Cir. 1999)*; see also Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir. 2001). If the plaintiff establishes the elements of a retaliation claim, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Keyser*, 265 F.3d at 750 (quoting *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996). However, as we made clear in *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503 (9th Cir. 2004), the defendants must show more than that they "*could* have" punished the plaintiffs in the absence of the protected speech; instead, "the burden is on the defendants to show" through evidence

that they "*would* have" punished the plaintiffs under those circumstances. *Id.* at 512 (emphasis added).[20]

To the extent the plaintiffs are attempting to show that their suspension was motivated by their petition, they have satisfied the first two parts of the *Mendocino Envtl. Ctr./Keyser* standard. The petition and complaints against Baughman were constitutionally protected, and the defendants' suspension of the plaintiffs would lead ordinary student athletes in the plaintiffs' position to refrain from complaining about an abusive coach in order to remain on the team. Thus, if the plaintiffs can show that their protected speech was a "substantial or motivating factor" in the defendants' decision to suspend them from the team permanently, and the defendants fail to show that they "would have taken the same action even in the absence" of that speech, then the defendants violated the plaintiffs' First Amendment rights. *See Mendocino Envtl. Ctr.*, 192 F.3d at 1300-01; *Keyser*, 265 F.3d at 750. It is this determination that we leave to the district court to consider in the first instance. Given our clarification of the standards for evaluating plaintiffs' student speech claims here, the district court may wish to permit the parties to present further evidence in support of their positions.

---

[20]This framework for First Amendment retaliation claims arises from the public employment context. Although we have rejected importing into the student speech context the public concern test from the public employment context, we did so because of *Tinker's* well-established standard for non-offensive, non-school sponsored student speech, which does not include a public concern element. However, as the defendants note, it appears that none of our cases has adopted a standard for evaluating *retaliation claims* in the context of student speech. *Cf. Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (adopting a standard for "assessing First Amendment retaliation claims against defendants *other than the plaintiff's employer*"). Given the absence of an established retaliation standard for student speech cases and the adequate protection for school officials and students provided by the *Mendocino Envtl. Ctr./Keyser* standard for First Amendment retaliation claims, we see no reason to adopt a different standard for the student speech context.

In sum, the district court on remand must determine whether the plaintiffs have offered evidence from which a reasonable jury could conclude that the petition and complaints against Baughman were a substantial or motivating factor in Corley's decision to suspend them permanently from the team.[21] In other words, the court must decide whether, viewing the evidence in the light most favorable to the plaintiffs, the record would permit a jury to infer that Corley punished the plaintiffs not simply for boycotting the game but also (or only) in retaliation for their having complained about Baughman and requested his resignation in the first place. If so, the defendants are not entitled to summary judgment unless they can show that they would have imposed a permanent suspension even in the absence of the plaintiffs' petition and complaints against Baughman. *See Mendocino Envtl. Ctr.*, 192 F.3d at 1300-01; *Keyser*, 265 F.3d at 750.[22]

## IV.   Conclusion

**[13]** We reverse in part and affirm in part the district court's grant of summary judgment in favor of the defendants. Contrary to the district court, we hold that *Tinker*'s standard for determining whether the First Amendment protects student speech does not include the public concern requirement

---

[21]In the First Amendment context, a plaintiff creates a genuine issue of material fact on the question of retaliatory motive when he or she produces, in addition to evidence that the defendant knew of the protected speech, at least (1) evidence of proximity in time between the protected speech and the allegedly retaliatory decision, (2) evidence that the defendant expressed opposition to the speech or (3) evidence that the defendant's proffered reason for the adverse action was false or pretextual. Such evidence may be direct or circumstantial. *See Keyser*, 265 F.3d at 751-52.

[22]For example, the defendants might be able to show that school officials in the past had permanently suspended Clatskanie High School student athletes from a team for refusing to play in a scheduled game. *See Settlegoode*, 371 F.3d at 512 (concluding that defendant school district failed to make the requisite showing under *Keyser* in part because it "offered no evidence that other teachers had been fired for [engaging in similar conduct as the plaintiff] in the past").

applicable in the government employment context. Applying *Tinker*, we further hold that the plaintiffs' petition and complaints against their coach were protected speech because that speech could not reasonably have led school officials to forecast substantial disruption of or material interference with a school activity. However, the plaintiffs' refusal to board the bus — even if we assume it was expressive conduct — was properly punishable by the defendants as unprotected speech because, as the district court found, the game boycott substantially disrupted and materially interfered with the operation of the varsity boys basketball program. Finally, on the question of retaliation, we hold that the defendants' permanent suspension of the plaintiffs would lead ordinary student athletes in the plaintiffs' position to refrain from complaining about an abusive coach in order to remain on the team. However, we reverse and remand to the district court to consider in the first instance whether the plaintiffs' protected speech (their petition and complaints against the coach) was a substantial or motivating factor in the defendants' disciplinary action. The parties shall bear their own costs.

**REVERSED IN PART, AFFIRMED IN PART and REMANDED**.