# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LOUISE CORALES; JAMIE SOLTERO;
THE ESTATE OF ANTHONY J.
SOLTERO; JANE ROE, I, a minor, by
her guardian ad litem MARY ROE,
I; JANE A MINOR, BY HER
GUARDIAN AD LITEM JOHN ROE 1;
GUILLERMO PRIETO,
    *Plaintiffs-Appellants,*

     v.

GENE BENNETT; THE ONTARIO-
MONTCLAIR SCHOOL DISTRICT;
KATHLEEN KINLEY,
    *Defendants-Appellees.*

No. 07-55892

D.C. No.
CV-06-00849-SGL

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen G. Larson, District Judge, Presiding

Argued and Submitted
October 22, 2008—Pasadena, California

Filed June 1, 2009

Before: Harry Pregerson and Cynthia Holcomb Hall,
Circuit Judges, and David Alan Ezra,* District Judge.

Opinion by Judge Hall

---

*The Honorable David Alan Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

## COUNSEL

R. Samuel Paz, Law Offices of R. Samuel Paz, Culver City, California, and Sonia M. Mercado, Sonia Mercado & Associates, Culver City, California, for the appellants.

Jacqueline DeWarr Berryessa, Law Offices of Margaret A. Chidester & Associates, Irvine, California, for the appellees.

## OPINION

HALL, Circuit Judge:

On March 28, 2006, Anthony Soltero, Annette Prieto, and two other students walked out of De Anza Middle School with the intent to participate in protests in their neighborhood against then-pending immigration reform measures. Two days later, they were disciplined for their one-day absence from school by Vice Principal Gene Bennett (Bennett), who took away one of their year-end activities and lectured them harshly regarding the possible legal consequences of truancy, including police involvement, a $250 fine, and a juvenile hall sentence. Tragically, Anthony committed suicide after school

that day. Anthony's parents and one of the other students brought this action against Bennett, Principal Kathleen Kinley (Kinley), and the Ontario-Montclair School District, alleging violations of the students' and parents' civil rights under 42 U.S.C. § 1983; violations of California's Unruh Act; intentional infliction of emotional distress, and negligently causing Anthony's suicide. The district court granted summary judgment to Defendants. Because Bennett did not violate the students' constitutional rights, there is no evidence that Bennett intended to harm the students, and because Anthony's death was not proximately caused by Bennett's actions, we affirm.

## I.   Background

On Tuesday, March 28, 2006, Anthony Soltero, an eighth-grade, fourteen-year-old student at De Anza Middle School (De Anza), Annette Prieto, and "one or two" other middle school students walked out of school around 8:30 or 9:00 in the morning.[1] They did not have prior permission from the school or their parents. They left school to participate in protests against the impending passage of federal immigration legislation that would have made it a crime to assist or help undocumented immigrants. In addition to Annette's deposition, Plaintiffs submitted Annette's handwritten account of the events of the week, which was written a few weeks after the incident at the direction of De Anza's principal. Annette testified in her deposition that the students' plan was to walk to nearby Ontario High School and to participate with other students in a protest. She testified that "mostly the whole schools, like, everybody in the schools were walking out and getting cited for it. Everybody was missing a lot of school because of that."[2] When they got to Ontario High School however, no one was there. They noticed the school was on

[1]Because we review the district court's order granting summary judgment to Defendants, we relate the facts in the light most favorable to Plaintiffs, the nonmoving party. *Beck v. City of Upland*, 527 F.3d 853, 857 n.1 (9th Cir. 2008). Defendants dispute many of these facts in opposing depositions.

[2]School district administrators were aware of the potential for walkouts by students and had sent a warning email the previous week to administration personnel within the district. Both Bennett and Kinley received the email.

lockdown. Eventually a few students from Ontario High School arrived and they walked for 60 to 90 minutes to Ontario Middle School, but nobody was there. At that point, it was about 11:00 am and De Anza Middle School had been let out for the day because of scheduled teacher conferences. The students decided to go home. While only four students left De Anza to participate in walkouts, two other Ontario middle schools had walkouts involving 50 to 150 students, and Montclair police issued citations to 125 students who had walked out of one of the middle schools.

Bennett testified that on the morning of Tuesday, March 28, 2006, a teacher told him "a girl had come up and asked another girl to leave campus with her as they were entering the classroom . . . ." Bennett was able to identify the girl and discover the identities of Anthony, Annette, and two other students. He required the four students to meet with him at his office Thursday morning when classes began.

Annette met with the other students before they entered Bennett's office. They discussed the consequences they were likely to face in the meeting, including that they "were going to have to pay a fine" and "lose one of [their] year-end activities." Annette testified that Anthony told her he was "scared of what was going to happen and nervous about just the consequences." Annette, too, stated she was so sick with nervousness about the consequences of missing school that she had stayed home from school on Wednesday as well.

The De Anza Parent Handbook explains that the consequences for a first-occurrence unexcused absence can range from after-school intervention (presumably detention) to Saturday Academy. Students participating in any protest that involves nonattendance at school are specifically identified as truant in the Ontario-Montclair School District regulations. AR 5131.4 (Prohibited Activities). In early March, a supplemental policy letter was mailed to the homes of all eighth-grade students explaining that if any disciplinary issues arose,

the student could lose one or more of their promotional activities, including a dance, a trip to Disneyland, or the promotion ceremony itself. Annette had been suspended several times previously during the school year for unrelated infractions. Anthony had been placed on probation stemming from an incident the previous spring in which he carried a knife to school. Bennett, in response to notification from a concerned parent, had discovered the knife and reported Anthony to the police. Anthony's mother, in her declaration, indicated Anthony could have been sent to jail for three years if he violated the terms of his probation.

Though accounts of the meeting between Bennett and the students differ substantially, Annette testified in her deposition that:

> Me, [two other students] and Anthony walked in, and he pointed at the three of us and said, "You guys are all dumb, dumb, and dumber." He said, "You guys are going to have to pay $250 fine;" that he is going to get the cops involved, and we're going to have to go to Juvenile Hall for, like, certain amount of years; and that we're stupid for doing it, and why did we think that we weren't going to get caught.

Bennett also told the students that they were going to lose a year-end activity, ultimately the Disneyland trip for each student. The reason for the students' absence was not discussed. After the meeting, the students returned to class for the day.

After school that day, Anthony told Annette that he was scared that his mother would be mad at him and he was worried about juvenile hall and having to pay a $250 fine. Anthony's mother was running errands that day, but called home to check in after school and to get a telephone number from Anthony. During the telephone call, Anthony told his mother that Bennett had caught him walking out, and that he was in

trouble and going to lose one of his eighth-grade activities as a result. Anthony's mother testified that he didn't say anything to make her worry about his safety and that she was able to get the telephone number from Anthony.[3] When she returned home about an hour later, she found Anthony on the floor of his room, suffering from a gunshot wound in an apparent suicide attempt. Anthony was pronounced dead later that evening.

Anthony left a suicide note which states in pertinent part: "I just want to tell you that I love you [guys] and I'll miss you, [and] tell this to all my family. I killed myself because [I] have to[o] many problems. . . . . Tell my teachers [they're] the best and tell Mr. [Bennett] he is a motherf#@(-)ker." He also apologized to his father for "making [him] mad."

None of the students were fined or sent to juvenile hall, and the police were never involved with the students' truancies.

On August 8, 2006, Louise Corales and Jaime Soltero (Anthony Soltero's parents), the Estate of Anthony J. Soltero, Jane Roe 1, Mary Roe 1, Jane Roe 2 (Annette Prieto), John Roe 1 (all minors represented by their guardians ad litem), and Guillermo Prieto (collectively "Plaintiffs") filed suit in the federal district court for the Central District of California against Bennett; the Ontario-Montclair School District; and Kinley, the principal of De Anza Middle School at the time of the protests (collectively "Defendants").[4]

The complaint stated six causes of action alleging the following: (1) violations of civil rights under 42 U.S.C. § 1983

---

[3]In her declaration, Anthony's mother did indicate that Anthony's voice "sounded real frightened," but specifically denied in her deposition testimony that he had said anything to make her worry about his safety.

[4]Kathleen Kinley had planned to retire as De Anza's principal the day after Anthony's suicide. She did step down that day, and Leticia Zaragoza assumed the duties of principal.

and § 1985(3)[5] against Bennett and Kinley in their individual capacities; (2) an unconstitutional policy, custom or practice causing constitutional violations against the school district[6]; (3) failure to train and supervise, causing constitutional violations, against Kinley; (4) civil rights violations under California's Unruh Act, Cal. Civ. Code §§ 51.7, 52.1; (5) intentional infliction of emotional distress, and (6) general negligence resulting in Anthony's death. Plaintiffs sought general, compensatory and punitive damages as well as injunctive and declaratory relief.

Defendants filed a Summary Judgment Motion on March 8, 2007. The district court granted the motion in full. As to the First Amendment claim, the district court found that there was a triable issue of fact as to whether the students' actions constituted expressive conduct. It then applied the Supreme Court's test for expressive conduct in schools, set forth in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969): school officials must justify their disciplinary decision by showing "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." The district court relied on this court's decision in *LaVine v. Blaine School Dist.*, 257 F.3d 981, 992 (9th Cir. 2001), for the proposition that school officials may take action to protect the safety of individual students even if such action interferes with the student's ability to express him or herself. The district court concluded that school officials are entitled and obligated to take appropriate action to ensure the safety of their students, including warning them (however sternly) regarding the students' legal obligation to stay in school during school hours. Having thus found that the school validly disciplined the students, the students' actions, in this context, did not constitute protected First Amendment activity.

---

[5]Plaintiffs do not raise the § 1985 claim on appeal and it is waived. *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986).

[6]Plaintiffs withdrew this claim and do not argue it on appeal.

The district court found no other Constitutional violation, and, therefore, no supervisory liability or liability under California's Unruh Act, which both require an underlying violation of Plaintiffs' constitutional rights. Finally, the district court held that Bennett's actions in lecturing the students fell far short of the type of extreme and outrageous conduct required to support a claim for intentional infliction of emotional distress, and that Anthony's act of committing suicide was both an extraordinary and unforeseeable consequence of the lecture.

## II.  Standard of Review

We review a grant of summary judgment de novo. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004) (citing *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). "We must determine, viewing the evidence in the light most favorable to . . . the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.* "We may affirm on any grounds supported by the record." *Id.* (citing *Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir. 2003)). "The underlying substantive law governing the claims determines whether or not [the disputed fact] is material." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). "There must be enough doubt for a 'reasonable trier of fact' to find for the plaintiffs in order to defeat the summary judgment motion." *Id.* (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

## III.  Discussion

### A.  First Amendment Retaliation Claim

Although the students' walkout was ostensibly to protest immigration reform legislation, there is no evidence that the students gave speeches, that they discussed matters of immigration reform, or that they carried placards or signs that con-

veyed their messages during the walk-out. Rather, the evidence reveals that the students left their school to engage in a protest march, met up with like-minded individuals from a local high school, and walked together to a third school. In the absence of any identifiable speech, these activities, if they are to be protected by the First Amendment, must fall within the definition of expressive conduct.

**[1]** The First Amendment protects conduct that is not speech but is nevertheless expressive in nature. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (wearing of black armband to protest Vietnam War); *United States v. O'Brien*, 391 U.S. 367 (1968) (flag-burning). However, First Amendment protection does not apply to all cases in which someone *intends* to convey a message by his or her conduct; rather, First Amendment protection applies only when "it is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999) (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).

**[2]** Here, the record is clear that the students intended to show their opposition to the proposed immigration reform by participating in a walkout. The record is less clear as to whether the walkout was likely to be perceived as such. Though Bennett admitted he knew of the walkouts taking place in the area, the reason for the students' absence was not discussed in the meeting. Likewise, while 100 to 150 students walked out of neighboring middle schools, only four students from De Anza appeared to have missed school that day. Still, because of warnings from school administrators about potential walkouts to protest the immigration reform, it is likely that an actual walkout of the four students would be perceived as a protest. Thus, we agree with the district court that a reasonable jury, when presented with this evidence, could conclude that the students were engaging in expressive conduct.

We next consider whether the conduct was protected, and if the school violated the students' First Amendment rights by

disciplining them for their participation in the walkout. Plaintiffs concede that the school had a right to discipline the students for the actual act of leaving campus without permission. Plaintiffs argue that the students were not disciplined for violating that rule, but rather for their expressive choice to participate in the immigration protests. As such, Plaintiffs assert a First Amendment retaliation claim.

"To establish a First Amendment retaliation claim in the student speech context, a plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006).

As a threshold matter, we must first determine the scope of the discipline the students received before we can consider whether that discipline constituted retaliation for their activity. Plaintiffs assert that the discipline imposed was comprised of both the loss of a year-end activity *and* Bennett's threats of police involvement, a $250 fine, and juvenile hall. Plaintiffs argue this total discipline imposed exceeded the Parent Handbook's stated maximum consequence of a Saturday Academy for a first-time truancy. Plaintiffs contest the district court's characterization of Bennett's words as merely a harsh lecture about the possible consequences of truancy, and assert that they instead constituted a "true threat" of corporal punishment by Bennett, and were reasonably interpreted by the students as such. The assumption that Bennett's words constituted not only a true threat, but "punishment," is incorrect.

[3] Plaintiffs' invocation of the "true threat" strand of First Amendment case law is misplaced. The true threat analysis is employed to determine when speech that is "an expression of an intention to inflict evil, injury, or damage on another" does not receive First Amendment protection. *Fogel v. Collins*, 531

F.3d 824, 830 (9th Cir. 2008) (quoting *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc)). " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Whether an objective or subjective standard is applied to determine "an intent to inflict bodily harm" exists, the speech is examined in the "light of its entire factual context, including the surrounding events and reaction of the listeners." *Fogel*, 531 F.3d at 831 (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990)).

**[4]** At issue here, however, is not whether *Bennett's* speech should be afforded First Amendment protection. *Cf. Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616, 622 (8th Cir. 2002). Bennett did not express any intent to commit any act of unlawful violence or to inflict bodily harm upon the students. Neither Plaintiffs nor the Government have filed any criminal or civil action for assault, where Bennett's actual or apparent ability to carry out the threat would be at issue. *See, e.g.*, *United States v. Chapman*, 528 F.3d 1215, 1219 (9th Cir. 2008).

**[5]** Plaintiffs instead attempt to connect Bennett's words to violence by characterizing them as a form of corporal punishment. This argument fails because the definition of corporal punishment under California law requires the "willful infliction of, or willfully caus[ing] the infliction of physical pain on a pupil." Cal. Educ. Code § 49001(a). Bennett did not inflict, nor attempt to inflict, any physical pain on any of the students. We decline to expand the scope of actionable threatened "harm" to encompass the legal consequences of one's actions. Bennett's perceived threats were not empty words to intimidate the students, but based on sections of the California Education Code, Welfare and Institutions Code, Penal Code, and Ontario municipal code. Together, these provisions

require compulsory education, prohibit truancy, permit habitually truant students to become wards of the juvenile court, make it a criminal violation for an adult to cause or facilitate the truancy of a minor, fine parents or guardians for the truancy of their children, permit arrest of truant students, and impose daytime loitering restrictions on minors. *See* Cal. Educ. Code §§ 48260, 48263, 48264, 48293; Cal. Welf. & Inst. Code § 601; Cal. Penal Code § 272(a)(1); Ontario Municipal Code §§ 5-7.04, 5-7.05.

**[6]** Because Bennett's statements cannot be interpreted as intended to cause any unlawful injury to the students, they do not constitute a true threat of corporal punishment. We thus agree with the district court's characterization of Bennett's statements as a stern lecture. Moreover, Plaintiffs cite no case law to support the proposition that threats of potential future consequences can alone constitute punishment.[7] Even if Bennett had the authority to impose a juvenile hall sentence as a form of retaliatory discipline, threatening an action is not the same as imposing discipline.

**[7]** In *Gaut v. Sunn*, 810 F.2d 923 (9th Cir. 1987), this court analyzed a prisoner's § 1983 claims arising out of beatings by prison guards and threats of bodily harm if he attempted to report the beating. We concluded that it "trivializes the eighth amendment to believe that a threat constitutes a constitutional wrong." *Id.* at 925. We stated that we found "no case that

---

[7]Indeed, Plaintiffs' own expert discussed the importance of a school administrator's use of discipline as a learning device to discuss the potential consequences of a path a student may be starting down. Bennett was speaking to a student who had previously been arrested and was placed on probation (Anthony) and another with multiple suspensions (Annette). In this situation, Bennett would arguably be remiss in his duties if he did not adequately warn the students of what consequences may result from continued truancies and what could have resulted from their actual truancy. *Cf. Terry v. Ohio*, 392 U.S. 1, 23 (1968) (noting it would have been poor police work if officer did not investigate suspicious, though legal, behavior).

squarely holds a threat to do an act prohibited by the Constitution is equivalent to doing the act itself." *Id.*; *see also Robinson v. Solano County*, 278 F.3d 1007, 1017 (9th Cir. 2002) (holding that "when the seizure itself is otherwise proper the mere threat of force cannot be an excessive use of force within the meaning of the Fourth Amendment"). Under Ninth Circuit law, Plaintiffs do not have a retaliation claim based on threats of discipline for First Amendment activity if that threat is itself based upon lawful consequences and is not *actually* administered.[8]

Here, the only consequence *actually* suffered by the students was the loss of one year-end extracurricular activity. Plaintiffs contend that even the loss of a year-end activity was a form of retaliation because the discipline did not comport with the consequences outlined in the Parent Handbook. The eighth-grade students were adequately warned, however, that they would not earn the privilege of attending the year-end activities unless they met all academic and behavioral requirements. Annette testified that the students realized they would likely lose their year-end activities as a result of their truancy even before they met with Bennett.

[8] Thus, any retaliation claim must be evaluated solely on Bennett's decision to discipline the students *at all*, when their act of leaving school was intended as expressive conduct. We now turn to the question of whether disciplining this act at all violated the students' First Amendment rights.

---

[8]Plaintiffs also characterize the fear the students felt as evidence that they were punished by Bennett's lecture. The facts of the case do not support this assertion. Annette testified in her deposition that the students discussed the possibility that they would be fined for skipping school, as demonstrators earlier in the week had been, before meeting with Bennett. She also testified that she and Anthony were scared and nervous about the discipline *before* the meeting, so much so that the day after the walkout she and one of the other girls stayed home "sick" with nervousness. Any incremental fear created by Bennett's informing the students of the possible consequence of their actions is insufficient to elevate Bennett's lecture to a threat.

### 1. Constitutionally Protected Activity

**[9]** The first prong of the retaliation claim is the determination of whether the students were disciplined for engaging in constitutionally protected activity. Because this case involves school discipline for arguably expressive conduct, both parties and the district court have analyzed the facts under *Tinker*. The *Tinker* framework, however, is intended to apply to decisions by a school to punish a student's speech or expressive conduct *as such*, because of its potentially disruptive impact on appropriate discipline in the operation of the school. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969). Thus *Tinker* contemplates a case-by-case decision by a school whether student speech either on campus or at an off-campus school-sponsored event is disruptive and punishable under the general authority of the school to minimize disruptions.

**[10]** Here, the students' expressive conduct, in seeking to participate in immigration protests, occurred entirely off-campus and was not school-sponsored. The students were punished not for any disruptive aspect of their expressive conduct, *as expressive conduct*, but for the disruption caused by the act of leaving campus without permission. Unlike in *Tinker* cases, the school was not exercising discretion when determining *whether* to discipline the student for their infraction of the general rule forbidding truancy. The disciplinary rules clearly specified both minimum and maximum sanctions for leaving campus without permission and missing school. In fact, district regulations specifically designated students participating in protests that involved nonattendance at school as truant, regardless of any parental approval of their act. Ontario-Montclair Admin. Reg. 5131.4. The case is, therefore, better understood as questioning whether Plaintiffs can be disciplined under the general content-neutral rule that students are not allowed to leave campus without permission, when their purpose for leaving is to engage in expressive conduct. *See Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419,

430-431 (9th Cir. 2008) (holding *Tinker* framework does not apply to content-neutral rules governing conduct).

The test for whether an exemption should be granted from a content-neutral rule of conduct to engage in expressive conduct was presented in *Clark v. Community for Creative Non-Violence (CCNV)*, 468 U.S. 288, 294 (1984):

> Symbolic expression of this kind may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial government interest, and if the interest is unrelated to the suppression of free speech.

(citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968).[9]

In *Clark v. CCNV*, the Supreme Court held that protestors were not entitled to an exemption to the National Park's general regulation limiting camping to designated areas simply because they were engaging in expressive conduct to protest homelessness. After determining that the rule was content-neutral, the Court went on to find that the interest in limiting wear and tear on parks was substantial and unrelated to the suppression of expression. *Id.* at 299. The Court further held that in determining whether the regulation was narrowly

---

[9]In *Pinard*, the court declined to apply the *O'Brien* test because the court found the *Tinker* analysis appropriate for analyzing restrictions on student speech and because the parties had not argued the application below and the factual record was not developed enough for the Ninth Circuit to determine if *O'Brien* should apply. *Pinard*, 467 F.3d at 759, n.1. This case does not present the same concerns. The rule here is not discretionary in its application, applies to conduct, rather than speech, and does not require any further factual development to determine its applicability. Furthermore, Defendants argued under *O'Brien* in their motions before the district court, and have continued to analyze the school's actions under an intermediate scrutiny framework on appeal. In reviewing a summary judgment motion, we may affirm on any ground supported by the record. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004).

drawn, the regulation should not be judged merely by the plaintiffs at hand, but also by all those similarly situated who would also be entitled to an exemption under the rule. *Id.* at 296-297.

**[11]** Similarly, the school's anti-truancy policy is a content-neutral rule that furthers an important interest unrelated to the suppression of expression. Indeed, Plaintiffs have repeatedly conceded that the school has a valid interest in forbidding students from leaving school without permission. The rule furthers several substantial government interests, including enforcing compulsory education, keeping minors safe from the influences of the street, maximizing school funding based on attendance (Cal. Educ. Code § 46010), and limiting potential liability for negligent failure to supervise a truant student properly. *See Hoyem v. Manhattan Beach City Sch. Dist.*, 22 Cal.3d 508, 523 (1978); *cf. Morse v. Frederick*, 127 S. Ct. 2618, 2622 (2007) (noting that "the rights of students must be applied in light of the special characteristics of the school environment"). None of these justifications is related to the suppression of speech. The Supreme Court specifically upheld the compelling government interests in compulsory education and keeping minors safe from the dangers of the streets in *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). *See also Jacobs*, 526 F.3d at 436 (finding increasing student achievement and enhancing safety important government interests); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 992 (9th Cir. 2001) (finding school's interest in safety of its students compelling).

**[12]** The rules which discipline truancies and leaving campus without permission support these goals and are narrowly tailored to the government's interests. The narrowly tailored test was expressed in *Turner v. Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 662 (1994): "the means chosen [must] not 'burden substantially more speech than is necessary to further the government's legitimate interests.' " (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). The means chosen, however, "need not be the least speech-restrictive means

of advancing the Government's interests . . . so long as [the interest] would be achieved less effectively absent the regulation." *Id.* at 662.

**[13]** In *Jacobs*, this court upheld a school uniform policy under the *Clark/O'Brien* analysis, finding that the policy left open ample alternative channels for student communication. *Jacobs*, 526 F.3d at 437. The policy in *Jacobs* only restricted students' speech during school hours and left the students free to "continue to express themselves through other and traditional methods of communication throughout the school day." *Id.* "For example, students are still permitted (if not encouraged) to have verbal conversations with other students, publish articles in school newspapers, and join student clubs." *Id.* Here too, the anti-truancy policy only limits students' expressive conduct during school hours. The students are free to participate in weekend or after-school events. De Anza was on a shortened schedule the week of the walk-outs, leaving greater-than-normal after-school time available to participate in immigration reform efforts. The students are free to engage in speech relating to immigrant rights on-campus, as the record suggests they did here, both amongst each other and in the classroom.

**[14]** In light of this analysis, the school's policy of disciplining truancies and leaving campus without permission easily satisfies the intermediate scrutiny applied to content-neutral rules of conduct. *See also Cox v. State of La.*, 379 U.S. 559, 563 (1965) (upholding reasonable time, place and manner restrictions on right to picket in front of a courthouse). As such, the incidental effect the rule has on the students' expressive conduct is permissible, and the students' First Amendment rights have not been infringed by punishing the act of leaving campus. Indeed, granting Plaintiffs an exemption to the otherwise generally applicable rule would cast suspicion on the Constitutionality of the rule itself, because it would no longer be content-neutral in application. *See Carey v. Brown*, 447 U.S. 455 (1980) (striking down regulation that exempted

labor picketing from general residential picketing ban as violating Equal Protection); *Clark*, 468 U.S. at 299 (noting propriety of evaluating all those similarly situated who would also seek an exemption to the generally-applicable rule); *see also Jacobs*, 526 F.3d at 433. To hold otherwise would be to allow 12 to 14 year old students to leave school without the permission of their parents or school authorities to engage in any claimed First Amendment activity, no matter the danger.

**[15]** Because the rule satisfies intermediate scrutiny under *Clark v. CCNV*, the school was entitled to enforce the rule against truancy even when the students sought to leave for expressive purposes. In this context, the Plaintiffs' act of leaving campus was not a constitutionally-protected activity, and therefore, Plaintiffs do not satisfy the first prong of a First Amendment retaliation claim. *Cf. Pinard*, 467 F.3d at 759 (holding that students' refusal to board a school bus was not protected by the First Amendment, even if expressive conduct, because the discipline was upheld under *Tinker*).

## 2. Deterrence Effect and Retaliatory Motive

**[16]** Even assuming Plaintiffs had shown they engaged in a constitutionally protected activity, their claim would fail nonetheless because they failed to show that Bennett's actions had a retaliatory motive. "In the First Amendment context, a plaintiff creates a genuine issue of material fact on the question of retaliatory motive when he or she produces, *in addition to evidence that the defendant knew of the protected speech*, at least (1) evidence of proximity in time between the protected speech and the allegedly retaliatory decision, (2) evidence that the defendant expressed opposition to the speech or (3) evidence that the defendant's proffered reason for the adverse action was false or pretextual." *Pinard*, 467 F.3d at 771 (emphasis added).

**[17]** Plaintiffs have not produced evidence of any of the three factors. Plaintiffs' reliance on *Sloman v. Tadlock*, 21

F.3d 1462 (9th Cir. 1994), is misplaced. There, plaintiffs were able to demonstrate that the disciplining officer both disagreed with their message and that his claimed reasons for citing and warning plaintiffs were groundless. *Id.* at 1469-1470. In contrast, Plaintiffs here have only produced evidence that Bennett *may* have known that the students skipped school to participate in the protest, but not that he was opposed to that protest. Bennett imposed discipline two days after the expressive conduct occurred and not in the heat of the moment. *Compare Morse*, 127 S. Ct. at 2622 (principal immediately reacted to student display of banner at Olympic torch relay, demanding that the banner be taken down and issuing 10-day suspension the same day). Furthermore, Plaintiffs' evidence showing that Bennett generally treated students harshly undermines any argument that his reason for disciplining the students was pretextual. Plaintiffs have shown no difference in Bennett's treatment of them than any other student he disciplined. "Such conclusory allegations, standing alone, are insufficient to prevent summary judgment." *Sloman*, 21 F.3d at 1474. Accordingly, we conclude that the Plaintiffs have failed to raise a triable issue of fact as to their First Amendment claim.

## B. Substantive Due Process

[18] Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with the rights implicit in the concept of ordered liberty.' " *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal citations omitted)). Plaintiffs argue that Bennett violated the students' substantive due process rights by issuing a "true threat" harsh enough to constitute the crime of child abuse under Cal. Penal Code §§ 273a(a) or 273a(b),[10] which a rea-

---

[10]California Penal Code §§ 273a(a) and 273a(b) read:

sonable jury could find "conscience shocking." But as noted above, Bennett's lecture to the students regarding the legal consequences of their actions does not constitute a "true threat" or corporal punishment. Moreover, Plaintiffs have submitted no evidence showing Bennett willfully inflicted any unjustifiable pain or mental suffering upon the students. Construing the facts most favorably to Plaintiffs, even if Bennett called the students "dumb, dumb, and dumber," told them they would have to pay a $250 fine, that he was going to involve the police, and that they would go to juvenile hall, Plaintiffs have not shown conduct egregious enough to shock the conscience. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846-847 (1998); *see also, e.g., Brittain v. Hansen*, 451 F.3d 982 (9th Cir. 2006) (police officer's condescending, hostile tone and threats of arrest directed at non-custodial mother during dispute not conscience-shocking). We affirm the district court's grant of summary judgment to Defendants on Plaintiffs' substantive due process claim.[11]

(a) Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years.

(b) Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor.

[11]Plaintiffs agree that our denial of their First Amendment claim necessarily forecloses their substantive due process claim on the grounds of the alleged free speech violation. *See Hufford v. McEnaney*, 249 F.3d 1142, 1151 (9th Cir. 2001) ("If, in a § 1983 suit, the plaintiff's claim can be ana-

## C.  Equal Protection Claim

**[19]** Plaintiffs also assert an equal protection claim, alleging the students were punished disproportionately based on their Mexican-American ethnicity. There is no evidence in the record, however, that suggests the students were disciplined on this basis or that their ethnicity motivated Bennett's decisions. *See* Fed.R.Civ.P. 56(e) ("an opposing party may not rely merely on allegations or denials in its own pleading"). Plaintiffs argue that this deficiency is due solely to the district court's improper grant of summary judgment to Defendants before they were provided notice and an opportunity to present triable issues of fact. This assertion is untenable.

The Defendants' motion before the district court sought summary judgment on all claims, on the basis that there was no genuine issue of material fact and Plaintiffs had failed to establish all necessary elements of those claims, including Plaintiffs' cause of action for violation of civil rights under 42 U.S.C. § 1983. Plaintiffs' equal protection claim arose under their § 1983 cause of action. Moreover, Defendants noted in their motion that "Bennett treated this situation (that of students who were found to be truant) the same as any other similar situation, without regard to the students' ethnicity." Defendants met their burden for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — there is an absence of evidence to support the non-moving party's case"). Furthermore, even if the Defendants had not explicitly moved for

---

lyzed under an explicit textual source of rights in the Constitution, a court should not resort to the more subjective standard of substantive due process.") (internal citation omitted). Plaintiffs' family relations substantive due process claim also fails, as there is no underlying dependent constitutional deprivation. *See Smith v. City of Fontana*, 818 F.2d 1411, 1419-1420 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).

summary judgment on the equal protection claim, the district court has the authority to decide an issue on summary judgment sua sponte, if the losing party was on notice to come forward with its evidence. *See Celotex*, 477 U.S. at 326. The Defendants moved for summary judgment on all claims, including those arising out of alleged violations of § 1983, Plaintiffs attempted to respond to that motion, and Defendants disclaimed any concession of the equal protection claim in the Reply Motion, all before argument on the motion before the district court. Plaintiffs were on notice that the equal protection claim was at issue and the district court was within its discretion to grant summary judgment on the claim. We affirm.

## D.   Supervisory Liability

"Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Preschooler II v. Clark County Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005)). In a section 1983 claim, "a supervisor is liable for the acts of his subordinates 'if the supervisor participated in or directed the violations, or knew of the violations of subordinates and failed to act to prevent them." *Preschooler II*, 479 F.3d at 1182 (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Id.* at 1183 (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

[20] Plaintiffs argue that, because of Bennett's previous disciplinary interactions with students, Principal Kinley had a

duty to investigate, train, and prevent further similar acts by Bennett. But because Plaintiffs have failed to establish any triable issue of fact as to any of their constitutional claims, a supervisory claim against Kinley is not sustainable.

## E.   State-Law Civil Rights Claims

[21] Plaintiffs next allege violations of their rights under sections 51.7 and 52.1 of California's civil rights law, the Unruh Act.   We affirm the district court's grant of summary judgment on each claim.

California Civil Code section 51.7(a) states in pertinent part:

> All persons within . . . this state have the right to be free from any *violence*, or *intimidation by threat of violence*, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, . . . or because another person perceives them to have one or more of those characteristics.

(emphasis added). Characteristics listed or defined in sections 51(b) or (e) are: sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation. Cal. Civ. Code § 51(b), (e).

Under the language of the statute, Plaintiffs were required to present evidence of "violence, or intimidation by threat of violence," committed against Plaintiffs on the basis of a protected ground (here, race or national origin).   As previously discussed in the First Amendment and Equal Protection analysis, the record supports neither requirement and Plaintiffs claim must fail.

Section 52.1(a) provides a cause of action where "a person or persons, whether or not acting under color of law, inter-

feres by threats, intimidation, or coercion, or attempts to inter-
fere by threats, intimidation, or coercion, with the exercise or
enjoyment by any individual or individuals" of rights under
federal or state law. Cal. Civ. Code § 52.1. As set forth above,
however, Plaintiffs' constitutional rights were not violated
and, thus, there is no basis to support Plaintiffs' cause of
action under § 52.1.

## F.   State Law Torts

### 1.   Intentional Infliction of Emotional Distress

Plaintiffs next allege that Bennett's lecture to the students
constituted intentional infliction of emotional distress.

> The elements of a prima facie case of intentional
> infliction of emotional distress in California are: '(1)
> extreme and outrageous conduct by the defendant
> with the intention of causing, or reckless disregard of
> the probability of causing, emotional distress; (2) the
> plaintiff's suffering severe or extreme emotional dis-
> tress; and (3) actual and proximate causation of the
> emotional distress by the defendant's outrageous
> conduct.'

*Tekle v. United States*, 511 F.3d 839, 855 (9th Cir. 2007) (as
amended) (quoting *Davidson v. City of Westminster*, 32 Cal.
3d 197, 209 (1982)) (internal quotation omitted). "Outra-
geous" conduct is that which is "so extreme as to exceed all
bounds of that usually tolerated in a civilized community."
*Tekle*, 511 F.3d at 856.

Bennett's statements in warning the students of the real
consequences of their continued violation of laws he did not
write was not extreme and outrageous conduct. The Plaintiffs'
own expert report states that "[p]art of an educator's responsi-
bility is to use the decisions made by students as a powerful
learning opportunity to ensure that decisions made later in life

are more thoughtful." Here, Bennett was faced with the task of disciplining Anthony, an almost fifteen year-old student who had already been placed on probation for possessing a knife at school and who faced a three year sentence in juvenile hall for a probation violation. His stern warning, while perhaps unduly harsh, was not extreme and outrageous.[12] Under these circumstances, a decision by this court that exposes an administrator to liability for sternly warning students of the consequences of their continued actions would severely handicap his or her ability to set children back on the correct path. This is especially true during the critical middle school years.

[22] Plaintiffs cite examples of ostensibly similar behavior that was found to be extreme and outrageous. But these cases are inapplicable, as each relied on the defendant's intent to harm the threatened party. *See, e.g.*, *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 498 (1970) (supervisor shouting insulting racial epithets and terminating employment to humiliate plaintiff); *Golden v. Dungan*, 20 Cal.App.3d 295, 305 (Ct. App. 1971) (process server knowingly and maliciously banging on door at midnight); *Agarwal v. Johnson*, 25 Cal.3d 932, 947 (1979) (use of racial epithet used with intention to humiliate and recommendation of termination of employee on unsupported grounds), *overruled on other grounds by White v. Ultramar, Inc.*, 21 Cal.4th 563, 574 n.4 (1999). In contrast, Plaintiffs have established no evidence to suggest that Bennett was motivated by ill will or a desire to harm the students. Plaintiffs have also not shown that the "scared" feelings the students felt were measurably different than those they claimed they had before meeting with Bennett. *See supra* note 8. Accordingly, we affirm the district court's grant of summary judgment to Defendants as to the claim for intentional infliction of emotional distress.

---

[12]Plaintiffs' reliance on the statements of district educators and administrators, who opined that if the students' version of events were true then Bennett's statements were "inappropriate," does not alter this conclusion.

### 2. Negligence

Plaintiffs' final cause of action is for negligence. Plaintiffs argue that Defendants' conduct negligently caused Anthony's suicide. Under California law, "[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." *McGarry v. Sax*, 158 Cal.App.4th 983, 994 (Ct. App. 2008) (internal quotations omitted). Defendants argue that Anthony's suicide was an intervening cause that broke the chain of causation, negating the element of proximate cause. Generally, an act is an intervening cause where it is unforeseeable or extraordinary. *See Maupin v. Widling*, 192 Cal.App.3d 568, 571 (Ct. App. 1987). Plaintiffs cannot show that Bennett's harsh lecture proximately caused Anthony's death.

Plaintiffs rely on *Tate v. Canonica*, 180 Cal.App.2d 898 (Ct. App. 1960). In that case, the California Court of Appeal allowed a widow and her children to overcome a demurrer where her deceased husband allegedly committed suicide after the defendants harassed, embarrassed, and humiliated him in the presence of others. *Id.* at 900. The *Tate* case primarily addressed situations in which the defendant *intended* to cause serious mental distress to the decedent, which is inapplicable here. The *Tate* case also addresses negligent acts that are the proximate cause of suicide, however, setting up a distinction between situations in which the decedent can control the impulse to commit suicide, and when he cannot control that impulse: "where the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death." *Id.* at 915.

**[23]** Although Plaintiffs' expert report opines on the cause of Anthony's suicide, attributing it, through the process of elimination, to Bennett's actions, the report does not give an opinion regarding whether Anthony had an uncontrollable impulse to commit suicide. Anthony attended classes after his meeting with Bennett, spoke with Annette and his mother, and wrote a detailed suicide note before committing suicide. Thus, the record seems to show he had the opportunity to appreciate the nature of his actions. Plaintiffs have failed to establish proximate causation between Bennett's statements and Anthony's suicide. Plaintiffs confuse this issue by arguing that the causation finding supported by their experts show that Anthony's death was foreseeable. This argument ignores the purpose of proximate causation, which seeks to avoid hindsight bias by limiting causation to those results which were foreseeable at the time of the action. Because Anthony's action in committing suicide was unforeseeable and extraordinary, plaintiffs have failed to raise a triable issue of fact as to the element of proximate cause. We affirm the district court's grant of summary judgment to Defendants as to the negligence claim.

## G.   Eleventh Amendment and Qualified Immunity

**[24]** The district court correctly determined that school districts in California are immune from § 1983 claims by virtue of Eleventh Amendment immunity. *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 254 (9th Cir. 1992). Plaintiffs do not contest this assertion. The district court also correctly found that the same is true of the state civil rights claims brought in federal court. *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006) (explaining that the Unruh Act does not consent to federal court actions). Eleventh Amendment immunity therefore provides an independent legal basis upon which to grant summary judgment in favor of the school district as to Plaintiffs' federal and state civil rights claims.

We need not reach the issue of whether qualified immunity extends to Bennett and Kinley, as Plaintiffs have raised no triable issue of fact as to whether either Bennett or Kinley violated the students' constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

**AFFIRMED.**