FILED

**NOT FOR PUBLICATION**

JAN 21 2010

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| KIMBERLY CURIEL; et al., | No. 07-17233 |
| Plaintiffs - Appellants, | D.C. No. CV-06-05751-WHA |
| v. | |
| THE COUNTY OF CONTRA COSTA; et al., | MEMORANDUM* |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted July 15, 2009
San Francisco, California

Before: HALL, W. FLETCHER, and PAEZ, Circuit Judges.

Appellants are members of two families present when fourteen deputies

from the County of Contra Costa entered and searched their house for murder

suspect, Scott Dyleski. Appellants sued for Fourth Amendment violations

stemming from the deputies' warrantless, unannounced entry into their home, the

---

* This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

force used in that entry, and the subsequent 13-hour detention and questioning. The district court granted the County and Sheriff's Department employees' (collectively "Appellees") motion for summary judgment, finding that, because no constitutional violations occurred, Appellees were entitled to federal immunity and the County could not be liable under *Monell*. That lack of constitutional violations also led the district court to grant summary judgment as to Appellants' state law claims. Appellants challenge the decision, and this court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part and reverse and remand in part.

## I.

Scott Dyleski and Robin Croen, sixteen-year-old friends, concocted a plan to steal credit card information and use those stolen numbers to purchase equipment to grow marijuana in Dyleski's closet. Dyleski lived in a house on Hunsaker Canyon Road with his mother, Esther, and two other families, the Curiels and McClure-Sikkemas.

On the morning of October 15, 2005, Pamela Vitale was murdered in her home on Hunsaker Canyon Road. The crime was a brutal one, involving multiple blows to the head and a stab wound, a symbol carved into her back, and a large amount of blood. The case garnered significant media attention. Although some weapons were found at the scene, the knife used was not found. Tracking dogs

indicated the perpetrator left on foot. In the evening of that same day, Dyleski arrived at Croen's house with scratches on his face, supposedly from a bush he ran into while walking in the canyon around his home.

In the following days, detectives from the Contra Costa County Sheriff's processed evidence from the Vitale murder, while Croen had conversations with an increasingly agitated Dyleski. Dyleski said his housemates knew about the credit card fraud, and he planned on admitting it to one of them, Fred Curiel, in an attempt to separate himself from the murder case. His only explanation for how the two were connected was that he had come into contact with Vitale during his walk and was afraid his DNA would be on her. During this same period, Curiel told Croen's father that Dyleski had attempted, unsuccessfully, to wipe his computer of evidence of the credit card fraud. Because some of the equipment ordered had been scheduled to ship to Vitale's address, Curiel was concerned Dyleski and Croen might be involved in Vitale's death.

On October 19, 2005, Croen and his father contacted the detectives, saying they had information about the Vitale murder. Two detectives and a deputy district attorney began interviewing them, while also instructing Sergeant James Mahoney to gather detectives at the Field Operations Bureau in case they were needed to serve search and arrest warrants. During the interview, the detectives became

concerned that evidence might be destroyed or that Dyleski might flee because (1) he had attempted to destroy evidence in a related crime days earlier, (2) his housemates had accessed the computer days earlier, (3) those housemates had not come to police with their information but had instead (4) visited an attorney the night before and called Croen's father to dissociate Dyleski from the murder, (5) Dyleski had been agitated the day before about being linked through evidence to the murder, and (6) Croen might tip off Dyleski because the two were good friends. At 7:30 pm., they decided that exigency supported a warrantless entry. At that time, Mahoney conducted a meeting of the detectives who had gathered at the Bureau, telling them they would be looking for a teen male who lived in a home with other families. The warrant had not yet issued and they did not know whether Dyleski was present at that address at that time. At 8:35 pm., the detectives ordered Mahoney to freeze[1] Dyleski's address, and Mahoney and the thirteen detectives he had gathered did so.

Ten deputies in dark raid gear moved to enter, while four remained on the perimeter. Because they saw unidentified people running through the house as

---

[1] A freeze occurs when officers enter and take control of—but do not search—a location to secure any weapons or dangerous people and prevent any evidence from being removed prior to a search warrant.

they were about to enter, they did not knock or announce themselves.[2]  At the time, Appellants—nine people in all—were in the house.  Deputies entered through the front and rear doors with guns drawn.

What followed over the next roughly seven minutes was a chaotic scene, with deputies rushing through the house to locate the inhabitants and secure the residence, while inhabitants attempted to run, hide, and leave the house.  The deputies used profanity and pointed guns at residents, including children, as the deputies came upon them in bedrooms and behind closed doors in closets and bathrooms.  Minor injuries occurred as the deputies encountered several residents.  Eventually, the inhabitants were assembled on the couches in the living room, at which point guns were no longer pointed at them, and Fred Curiel had been handcuffed.  Michael Sikkema came through the front door with groceries and flowers and was promptly handcuffed for approximately ten minutes.

Twenty-three minutes after they had arrived, ten deputies left to go to another address where they were told they would find Dyleski, while four deputies remained to keep the house and its ten inhabitants secure.  Roughly an hour after Fred's handcuffs had been put on, and after three requests to have them removed

---

[2] Given conflicting reports, we assume the deputies did not knock before entering.

due to tightness, they were removed. Appellants remained on the couches for some time, given permission to get food and blankets, and later allowed greater movement. They could not use the telephone.

A search warrant was issued at 10:55 pm., but because the nighttime service box was not checked, new warrants had to be prepared and were authorized at 1:36 am. on October 20, 2005. Once the search warrant arrived, deputies began conducting an extensive search of the house and grounds. At some point, Fred Curiel, Hazel McClure, and Michael Sikkema were taken to the Field Operations Bureau for questioning about the credit card fraud, murder, and computer. Fred and Hazel agreed to go. At some point, media arrived. The deputies remained, searching, until 11 am.

## II.

We find that the district court erred in holding the warrantless entry justified by exigency as a matter of law. Based on the facts alleged, a jury could reasonably find that the deputies had no specific facts indicating that Dyleski was an *imminent* flight risk or that any *imminent* destruction of evidence by Dyleski or Appellants was likely, given that neither Dyleski nor Appellants had any suspicion of immediate apprehension or the deputies' imminent arrival, which distinguishes this case from others where exigency was found. *See United States v. George*, 883

F.2d 1407, 1412–15 (9th Cir. 1989); *see also Illinois v. McArthur*, 531 U.S. 326, 331–32 (2001); *Dixon v. Wallowa County*, 336 F.3d 1013, 1018 (9th Cir. 2003); *United States v. Lindsey*, 877 F.2d 777, 781 (9th Cir. 1989); *United States v. Blake*, 632 F.2d 731, 734 (9th Cir. 1980). A jury could also find the deputies failed to show insufficient time to obtain a warrant. *United States v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000). Because the government failed to meet its "heavy burden" to show "specific and articulable facts [justifying] the finding of exigent circumstances" that would support departing from the usual procedure of obtaining a warrant, *United States v. Driver*, 776 F.2d 807, 810 (9th Cir. 1985), a jury could reasonably find that Appellants' Fourth Amendment rights were violated.

However, while the requirement of imminence is settled, the lack of case law considering a situation in which evidence has previously been destroyed and in which additional factors such as the suspect's escalating agitation, the serious crime, and significant media attention influencing the officers' decisions are all present makes the violation not clearly established. Additionally, the federal district court judge found no constitutional violation here, suggesting the violation may not have been clear to the officers. Thus, Appellees were entitled to qualified immunity. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 476 (9th Cir. 2007) (finding qualified immunity proper where there is a reasonable mistake as to what

the law requires).  Because we may affirm the district court on any ground supported by the record, *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009), we affirm the district court's grant of summary judgment as to the warrantless entry.

## III.

We find that a jury could also reasonably conclude that the failure to knock-and-announce constituted a violation of Appellants' Fourth Amendment rights because the deputies created their own exigency.  *See Driver*, 776 F.2d at 810–11. However, this violation was likewise not a clearly established one, given case law suggesting that an intentional creation of the exigency (absent in this case) was required.  *See United States v. VonWillie*, 59 F.3d 922, 926 (9th Cir. 1995).   Thus, Appellees were also entitled to qualified immunity on this issue, *see Blankenhorn*, 485 F.3d at 476, and we affirm the district court's grant of summary judgment as to the failure to announce.

## IV.

The district court also granted summary judgment on Appellants' Fourth Amendment excessive force claims, concluding that the force used was reasonable

and necessary to secure the premises.[3] The court therefore determined that the officers were entitled to qualified immunity. We disagree.

We evaluate Appellants' excessive force claims under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386 (1989). In so doing we consider all the facts and circumstances surrounding the deputies' conduct, such as "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *see also Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994). Here, a reasonable jury could find that the deputies used excessive force to seize Appellants and therefore violated their Fourth Amendment rights.

---

[3]The district court did not address the conduct of each of the deputies who made up the entry team. As we understand Appellants' arguments, their excessive force claims focus on the deputies who initially entered the house: Park, Mahoney, Goldberg, Bailey, Fawell, Garibay, Moore, Uyeda, Santiago and Ryan. Four other deputies, Daley, Clark, Van Zelf and Oest, were present but remained outside until the premises were secure. One other deputy, Aranda, and trainee Hadley arrived after the entry team had secured the house. Appellants do not argue that deputies Daly, Clark, Van Zelf, Oest and Aranda, and trainee Hadley either engaged in wrongful conduct or that, for some other reason, they too should be responsible for any use of excessive force. Accordingly, we affirm the grant of summary judgment in favor of these Appellees on Appellants' excessive force claims.

The brutal murder that the deputies were investigating and the deputies' knowledge that Scott Dyleski resided at the house and that a rifle might be stored there suggest that the deputies' conduct was reasonable. While we do not diminish the significance of these circumstances, when balanced against other facts, a reasonable jury could find that the force used was not reasonable.

Without having obtained a search warrant, the deputies, dressed in dark raid gear, burst into the Curiel's home to look for Scott Dyleski and evidence of the murder of Vitale. They entered the house, unannounced, with their guns drawn, and pointed their guns at the occupants, including children, while giving commands to get down on the floor. In one instance, Deputy Uyeda pointed his modified m-16 assault rifle at Hazel McClure and her children as they cowered in one of the bathrooms. In several other encounters, the deputies pointed their guns within inches of the person's head. Not only did the deputies train their guns on the occupants, they threatened deadly harm if the individuals failed to comply with their commands. The threats were laced with vulgar profanity.

As the deputies searched the house, they kicked in one interior door and damaged another. After Fred Curiel complied with an order to get down on the floor, he was handcuffed in such a way that the cuffs caused pain. Although he complained that the handcuffs hurt, they were not removed for approximately one

hour. During the encounter with Fred Curiel, one of the deputies slammed his head to the ground when he yelled, "Please don't shoot my family." At approximately the same time, Deputy Parker pinned Fred Curiel's daughter, J., to the ground by placing her left boot on J.'s back and her right knee on J.'s arm. Although the physical injuries sustained by these appellants were minor, significant physical injury is not required to maintain an excessive force claim. *Wilks v. Reyes*, 5 F.3d 412, 416 (9th Cir. 1993).

When Michael Sikkema returned home with a bag of groceries, he was greeted inside the house with a gun pointed to his head, and threatened with harm if he did not comply with the officers' commands. Once he was on the ground, he too was handcuffed.

The officers pursued this course of conduct even though it was obvious that none of the occupants resembled a sixteen-year old white male. Although it took only fifteen to twenty minutes to secure the house, the intensity of the deputies' actions and their threats of harm while pointing guns caused considerable fear among the occupants. In light of all these circumstances, we conclude that a reasonable jury could find that the entry team deputies used excessive force in violation of the Fourth Amendment.

Having determined that Appellants' factual submissions could establish a constitutional violation, we proceed to consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "This step . . . is an inquiry into the reasonableness of the officer's belief in the *legality* of his actions." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (emphasis in original).

We recognized in *Robinson v. Solano County*, 278 F.3d 1007, 1014-15 (9th Cir. 2002) (en banc), that pointing a gun at someone may constitute excessive force, even if it does not cause physical injury. We also have held that overly tight handcuffs may constitute excessive force. *See Meredith v. Erath*, 342 F.3d 1057, 1063-64 (9th Cir. 2003). Nevertheless, because the deputies dispute Appellants' version of what happened inside the Curiel's home and resolution of those facts are material to a proper determination of the reasonableness of the deputies' belief in the legality of their actions, we leave the determination of qualified immunity to the district court on remand. *See Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (finding it premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom") (internal citation omitted).

Although Appellants emphasize the deputies' use of profanity and threats of harm, they do not allege or argue that such conduct, without more, constitutes a separate Fourth Amendment violation. We therefore do not address whether Appellees are entitled to qualified immunity for such conduct.

We reverse the grant of summary judgment on these claims and remand for further proceedings.

**V.**

Next, we find no constitutional violation as to Appellants' detention. During the period prior to Scott's capture, exigency justified the seizure because a reasonable officer could believe that permitting Appellants to leave or have access to a telephone when they knew where Dyleski was might imperil the safety of the officers trying to catch a dangerous suspect or "improperly frustrate legitimate law enforcement efforts." *United States v. George*, 883 F.2d 1407, 1412 (9th Cir. 1989); *see Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (looking to whether exigent circumstances permitted temporary warrantless seizure). Detention during the roughly two-hour period between Dyleski's capture and the procurement of a search warrant was justified by the fear that evidence would be destroyed by Dyleski's housemates. Based on Appellants behavior in the previous days, the deputies had "good reason to fear" Appellants might be complicit in the crimes or

-13-

have an interest in keeping the evidence out of police hands once they knew the deputies were about to discover it. *McArthur*, 531 U.S. at 332. Finally, the detention during the period during which a search occurred attendant to a search warrant, was likewise reasonable. The need to "facilitat[e] the orderly completion of [a] search" provides substantial justification for detaining an occupant, even if not a suspect, *Muehler v. Mena*, 544 U.S. 93, 98, 99 n.2 (2005), and there is no indication the deputies wasted time in the conduct of this difficult search, *see Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006). Throughout, the manner of detention was reasonable, in light of the efforts made to make Appellants comfortable and the need to prevent media leaks that would have made the search more difficult. *See id.* at 1066, 1069; *Ganwich v. Knapp*, 319 F.3d 1115, 1123 (9th Cir. 2003) (permitting the curtailment of telephone usage "so long as that restriction is carefully tailored to its underlying justification").

For these reasons, Appellees were entitled to qualified immunity and we affirm the district court's grant of summary judgment as to this issue.

## VII.

Finally, the questioning of Fred Curiel and Hazel McClure did not constitute a Fourth Amendment violation. The district court found Fred and Hazel agreed to talk and their release was not explicitly conditioned on their cooperation. These

findings are not clearly erroneous. The consensual questioning was permissible and did not prolong the detention. *See Florida v. Bostick*, 501 U.S. 429, 434–35 (1991); *Muehler v. Mena*, 544 U.S. 93, 101 (2005). Thus, we affirm the district court's finding of qualified immunity and grant of summary judgment as to claims arising from this questioning.

## VIII.

For these reasons, we **AFFIRM** the district court's grant of summary judgment as to the claims stemming from the warrantless, unannounced entry, the detention, and the questioning of Curiel and McClure. We **REVERSE** the district court's decision to grant summary judgment as to the excessive force claim. Because we have held that a jury could find constitutional violations, we also **REVERSE** the district court's grant of summary judgment to the County on the issue of municipal liability for those violations, and **REVERSE** the grant of summary judgment as to Appellants' state law claims for assault, battery, violation of California Civil Code § 52.1, and intentional infliction of emotional distress, to the extent the last claim was based on the entry or force used. Each party is to bear its own costs.

**AFFIRM in part and REVERSED and REMANDED in part.**